COUNTY OF KERN and the City of Bakersfield, Petitioners,

v.

CIVIL AERONAUTICS BOARD and United Airlines, Inc., Respondents,

The State of California, Intervenor.

Nos. 79–7308, 80–7099.

United States Court of Appeals, Ninth Circuit.

Argued Feb. 12, 1980.

Submitted June 2, 1980.

Decided Dec. 8, 1980.

As Amended on Denial of Rehearing and Rehearing En Banc May 13, 1981.

Ralph B. Jordan, County Counsel, Bakersfield, Cal., Sarah E. Perry, Washington, D.C., for Bakersfield.

Frank J. Costello, Washington, D.C., for City of Kern.

Glen M. Bendixsen, Washington, D.C., argued, for CAB; John J. Powers, III, Washington, D.C., on brief.

Hans U. Stucki, Chicago, Ill., for United Airlines.

Mark F. Mispagel, Sacramento, Cal., for State of California.

Before MERRILL and FARRIS, Circuit Judges, and BONSAL,* District Judge.

FARRIS, Circuit Judge:

Kern County and the City of Bakersfield, California, petition for review of two orders of the Civil Aeronautics Board fixing the essential level of air transportation for Bakersfield and allowing United Airlines to ter-

---

* Honorable DUDLEY B. BONSAL, Senior United States District Judge of the Southern District of New York, sitting by designation.

minate its service to Bakersfield. *See* 49 U.S.C. § 1486 (1976). The State of California has intervened in support of the petition. We affirm.

## I. LEGAL BACKGROUND

On October 24, 1978, Congress passed the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705, which ended forty years of economic regulation of the domestic airline industry under the Civil Aeronautics Act of 1938, ch. 601, 52 Stat. 973, and the Federal Aviation Act of 1958, Pub.L. No. 85–726, 72 Stat. 731. While previous law required the Civil Aeronautics Board's permission for termination of air service, section 401(j) of the Deregulation Act, 49 U.S.C. § 1371(j) (Supp.II 1978), allows an air carrier to terminate service by giving notice to the Board, the state's aeronautics commission, and directly affected communities. Recognizing that instant deregulation might cause severe economic disruption, Congress provided for phased deregulation over a ten–year transition period. During this period, the Deregulation Act requires the Board to assure that small communities served by at least one certificated carrier at the onset of deregulation, or "eligible points," receive "essential air transportation." *See generally* Deregulation Act § 419, 49 U.S.C. § 1389(a)(6), (f) (Supp.II 1978).

Under section 419, if any such eligible point is served by no more than one certificated carrier at any time during the ten–year period, the Board must determine, within a specific period, the "essential air transportation" for that point. 49 U.S.C. § 1389(a)(2)(B) (Supp.II 1978). The Board must periodically review that determination. *Id.* § 1389(a)(2)(C). If, before the Board can make a determination, a carrier gives notice of termination of service "which reasonably appears to deprive [an eligible] point of essential air transportation," the Board can delay the termination until such a determination is made. Deregulation Act § 419(a)(10), 49 U.S.C. § 1389(a)(10) (Supp.II 1978).

Once a point's essential air transportation is set, the Board must act to maintain that level of air service for the point. *See, e. g.,*

49 U.S.C. § 1389(a)(5) (Supp.II 1978). It may not permit a carrier to terminate service if such termination would deprive the point of essential air transportation. 49 U.S.C. § 1389(a)(6) (Supp.II 1978). It may grant subsidies when denial of termination results in a carrier operating at a loss, 49 U.S.C. § 1389(a)(7)(B) (Supp.II 1978), or when compensation is necessary to induce a new carrier to initiate service, 49 U.S.C. § 1389(a)(5) (Supp.II 1978).

## II. FACTUAL BACKGROUND

At the time the Deregulation Act was passed, United Airlines offered four daily nonstop round trips between Bakersfield's airport, Meadows Field, and Los Angeles with Boeing 737 aircraft for a total of 824 seats per day; United offered two daily nonstops and a daily one–stop in the Bakersfield–to–San Francisco market with Boeing 737 aircraft for a total of 618 seats; and Hughes Airwest offered a daily DC–9 round trip between Bakersfield and Las Vegas, providing another 200 seats, in addition to a one–stop San Francisco–to–Bakersfield flight providing 200 seats. Soon after enactment of the Deregulation Act, on December 1, 1978, Hughes Airwest filed a section 401(j) notice of its intention to terminate all service to Bakersfield. On January 11, 1979, the Board issued a short notice indicating that it would not exercise its section 419 power to prevent the termination.

On February 23, 1979, United filed a section 401(j) notice announcing its intention to suspend all service in the San Francisco market and to reduce service in the Los Angeles market. On April 26, Kern County and Bakersfield filed a petition requesting the Board, under section 419(a)(6) and (10), 49 U.S.C. § 1389(a)(6), (10) (Supp.II 1978), to require United to maintain its existing level of service in both markets pending a final determination of essential air transportation. On May 10, after several responses supporting the petition were filed with the Board, representatives of the Board's staff came to Bakersfield, heard some thirty community representatives explain the community's needs and concerns

and received additional economic studies supporting Bakersfield's request.

On June 5, the Board issued an order refusing to prevent United's reduction of service in the Los Angeles market, noting that competitive forces would cure the problem. In the San Francisco market, the Board found the apparent level of essential air transportation to be 80 passengers, and 120 seats, per day. It further found that Air Pacific was fit, willing, and able to provide that service since it proposed three daily nonstop round trips with fifty-seat Dash 7 aircraft. Finally, United was directed to be prepared to resume service if Air Pacific was unable to provide the minimal service required by the order. Kern County and Bakersfield challenge this order in case No. 79–7308.

On October 24, 1979, the Board issued an order setting the "essential air service" for Bakersfield at 80 passengers, and 160 seats,[1] daily to and from Los Angeles and San Francisco. Case No. 80–7099 involves review of this order. We have consolidated the two cases.

Air Pacific initially experienced severe difficulties such as persistent lateness and canceled flights. The level of service to Meadows Field became so clearly inadequate that the Board ordered United back into service for five days. Later, Air Pacific was taken over by Golden Gate Airlines, and a second commuter line, Swift–Aire, initiated service. As a result, after a hectic first year and with United's service fully terminated, the petitioners in March, 1980, advised the public that the "worst is over" and that Meadows Field could supply the public's requirements. It exhorted the community to utilize the new services: "If the community will support the airlines—the airlines will support the community." As of May 1, 1980, Bakersfield was receiving from commuter lines daily air service of 384 seats to, and 330 seats from, San Francisco. It was receiving daily air service of 488 seats to, and 584 seats from, Los Angeles.

## III. ORDERS UNDER REVIEW

These cases therefore present two distinct issues. Kern County and Bakersfield first ask us to review the Board's June 1979 order under Deregulation Act § 419(a)(10), 49 U.S.C. § 1389(a)(10) (Supp.II 1978), allowing termination of United's Bakersfield service. In scrutinizing that order, we must determine whether the termination "reasonably appear[ed] to deprive [Bakersfield] of essential air transportation." *Id.* Review of the October 1979 order requires us to determine whether the Board properly determined Bakersfield's essential air transportation. We scrutinize the October 1979 order first.

## IV. DETERMINATION OF "ESSENTIAL AIR TRANSPORTATION"

Our authority to overturn the Board's interpretation of "essential air transportation" is limited. "[T]he construction of a statute by those charged with its administration is entitled to substantial deference. *United States v. Rutherford,* 442 U.S. 544, 553, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68 (1979); *Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 251, 99 S.Ct. 505, 514, 58 L.Ed.2d 484 (1978). This is particularly true where, as here, the statute being implemented is "untried and new." *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed. 2d 924 (1961); *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). The issue on review is not whether the Board's interpretation of "essential air transportation" is the best possible interpretation, but whether "there are compelling indications that the administrative interpretation was wrong . . . ." *DHL Corp. v. CAB,* 584 F.2d 914, 919–20 (9th Cir. 1978). *See also Baur v. Mathews,* 578 F.2d 228, 233 (9th Cir. 1978) (when agency has had extensive experience in administering statute, its regulations will be overruled only on clear showing of contrary congressional intent).

---

1. The 120 seat level set by the June 1979 order was calculated from the 80 passenger level by using a 65% load factor. In its October 1979 order the Board used a 50% load factor, and thus set a 160 seat level. The load factor was modified on the basis of a study done by the Board's Office of Economic Analysis.

The Deregulation Act defines "essential air transportation" as

scheduled air transportation of persons to a point provided under such criteria as the Board determines satisfies the needs of the community concerned for air transportation to one or more communities of interest and insures access to the Nation's air transportation system . . . .

49 U.S.C. § 1389(f) (Supp.II 1978). In making its October 1979 final determination of Bakersfield's essential air transportation, the Board followed a policy set forth in its regulations:

Only under unusual circumstances will an eligible point's essential air service level be fixed at a number of flights that will accommodate more than 80 passengers each day at the point (40 passengers from the eligible point and 40 passengers back to that point). Generally, 80 passengers can be accommodated by guaranteeing 120 available seats each day at the point (60 seats in each direction).

14 C.F.R. § 398.6(a) (1980).[2]

Kern County and Bakersfield assert that this regulation, as applied to them, is inconsistent with the Deregulation Act. They contend that the Act requires that "essential air transportation" be defined for each point in accordance with the particular needs of that community. In addition to citing the previously quoted statutory definition of "essential air transportation," they note that the statute provides that the Board is to make its essential air transportation determination "after considering the views of any interested community and the State agency of the State in which such community is located." 49 U.S.C. § 1389(a)(2)(A), (B) (Supp.II 1978).

We disagree with these contentions. It is "fundamental that a section of a statute should not be read in isolation from the context of the whole Act . . . ." *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). In interpreting "essential air transportation," we "'must not be guided by a single sentence

. . . but [should] look to the provisions of the whole law, and to its object and policy.'" *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956) (quoting *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)). A major policy of the Deregulation Act is the "placement of maximum reliance on competitive market forces and on actual and potential competition . . . to provide the needed air transportation system." 49 U.S.C. § 1302(a)(4) (Supp.II 1978). Also, the Act was intended to promote the "encouragement, development, and maintenance of an air transportation system relying on actual and potential competition." 49 U.S.C. § 1302(a)(9) (Supp.II 1978). A competing policy requires the Board also to determine certain small communities' needs for air transportation to one or more communities of interest and to insure that the small communities have access to the nation's air transportation system. 49 U.S.C. § 1389(f) (Supp.II 1978).

In light of the competing policies stated in the Act, the Board's interpretation of "essential air transportation" is reasonable. On the one hand, it relies heavily on actual and potential competition and provides an environment for smaller, cost efficient airlines to become established in markets where the major airlines can operate only at a loss. (For example, United claims that it was losing $10,000 per day serving Kern County.) On the other hand, it guarantees access by small communities to this nation's air transportation system. The number of seats guaranteed was not established arbitrarily, but was based on reliable, unrebutted studies which showed that markets with a certain number of passengers would automatically be provided adequate service by the free market. Civil Aeronautics Board, Service to Small Communities, A Staff Study of the Bureau of Operating Rights, Part III, at 5 (1973); U.S. Department of Transportation, Air Service to Small Communities, A Report by the Office of Transportation Regulatory Policy 37–49 (1976), *cited at* 44 Fed.Reg. 52,652 n.2 (1979).

**2.** For the October 1979 order, the Board changed the 120 seat level to 160 seats. *See* *supra* note 1.

The Board's regulations also provide for an individualized determination of a community's needs. In those communities where the "essential air transportation" guideline is not adequate, the regulations allow a variance if special circumstances are shown. 14 C.F.R. § 398.6(b) (1980). Several communities have successfully shown that their particular needs require a higher essential air transportation figure. *See e. g.*, 44 Fed.Reg. 52,646 (1979). However, after considering evidence from local, county, and state officials, the Board concluded that Kern County's needs did not justify an "essential air transportation" figure above 160 seats per day.

Congressional history supports the Board's interpretation of "essential air transportation." Senator Cannon, chairman of the Senate's Aviation Subcommittee and one of the Act's managers, stated:

> Indeed, the only area of the airline business which requires substantial Government intervention is service to the Nation's very smallest communities where there are not enough passengers for profitable operations.

124 Cong.Rec. S5,850 (daily ed. Apr. 19, 1978). Senator Cannon's statement is synonymous with the Board's interpretation of "essential air transportation."

Hindsight has apparently proved that the Board's prediction that competitive forces would provide sufficient air service was correct. Once United stated its desire to abandon its Kern County operation, a willing and presumably able carrier was found to provide service to Kern County. Although initial problems caused the Board to order United to re—enter the Kern County market temporarily, the county now receives essentially the same service as previously provided by United except that the flight equipment is smaller and more efficient. We uphold the Board's interpretation of "essential air transportation" in its October 1979 order as reasonable and in compliance with the underlying policies of the Deregulation Act.

## V. PERMISSION FOR UNITED'S TERMINATION

The June 1979 order was based upon a tentative determination in terms of passenger capacity of essential air transportation that was made final in the October order. Since we uphold the final determination, we necessarily uphold the tentative determination embodied in the June order.[3] United's departure from the Bakersfield market did not deprive Kern County and Bakersfield of a reasonably determined essential level of service. We therefore affirm the June 1979 order.

Affirmed.

## STATEMENT ON DENIAL OF REHEARING

In their petition for rehearing, Kern County and Bakersfield assert that the variance allowed by 14 C.F.R. § 398.6(b) (1980) from the Board's 40 passenger guideline is "wholly illusory." They cite the Board's recent decision in *Essential Air Transportation Determinations of Augusta/Waterfield, Maine, Bangor, Maine, and Lewiston/Auburn, Maine*, Order No. 81–2–39 (C.A.B. Feb. 9, 1981), which applied the guideline to several Maine communities. Member Dalley vigorously dissented, contending that the communities had shown the "unusual circumstances" required for a variance.

We upheld the guidelines in part because of the availability of a variance. A full hearing and individualized determination is not denied by application of threshold requirements or guidelines if those requirements or guidelines may be waived upon a showing of special circumstances. *See FPC v. Texaco*, 377 U.S. 33, 39–42, 84 S.Ct. 1105, 1109–1111, 12 L.Ed.2d 112 (1964); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 201–05, 76 S.Ct. 763, 769–71, 100 L.Ed.

---

**3.** Actually, the June 1979 order guaranteed 120 seats in the San Francisco market while the October 1979 order guaranteed a combined total of 160 seats in the San Francisco and Los Angeles markets. The change from 120 to 160 seats resulted from the adoption of a 50% load factor in lieu of 65%. *See supra* note 1. We uphold both factors, since they were reasonable when applied.

1081 (1956). If, as Kern County and Bakersfield contend, the Board has refused to allow a variance when unusual circumstances are shown in other cases, it has violated its regulations and perhaps the statutory requirement that it make a determination. Review is available in such cases. We need not address this issue here because Kern County and Bakersfield have shown no "unusual circumstances."

MERRILL, Circuit Judge, dissenting:

I dissent as to the October, 1979, order. The question is not whether Bakersfield and Kern County are now receiving essential air service. The question is whether the Board, by its order, has determined Bakersfield's essential air transportation in the manner contemplated by the Airlines Deregulation Act. In my judgment, it has not.

It must be emphasized that the Act contemplates that deregulation will be phased in over a ten–year transition period. It is the sufficiency of the assurance that essential air transportation will be provided during that transition period that is here at issue.

The Board's order follows guidelines established by regulation. Those guidelines provide a formula which has, with few exceptions, been applied across the board to all communities as to which a determination must be made. However, as defined by § 1389(f), essential transportation is that which will "satisfy the needs of the community." Senator Cannon, chairman of the Senate's Aviation Subcommittee and one of the Act's managers, said at one point with reference to the pending bill:

"The key to the whole program is to obtain the quality and quantity service which best meets the unique needs of each community * * *."

The Act, then, contemplates that the Board will, as to each eligible point, ascertain and set forth the needs of the community for air transportation, and will then, by the methods set forth in the Act, see to it that the community receives that level of service during the transition period.

The Board's determination in this case does not comply with the Act. It is in truth no determination at all. It does not ascertain the extent of the community's needs for air transportation. It does not serve to give assurance that the Board will see to it that air service to the level of need is provided. Instead, it announces the Board's conclusion that air traffic above the specified minimum can profitably be supplied and thus that if any community generates traffic in excess of this minimum, market forces will operate to supply it as new airlines are attracted by the profit potential. The Board's determination, then, is simply a *prediction* of how the community's needs—whatever they may be—will be met; a *prediction* that Board assistance will not be required where traffic exceeds the specified minimum. By determining "essential air transportation" in this fashion the Board has substituted prediction for the assurance that the Act contemplates: that the community's needs *will* be met—by market forces or by Board assistance—during the transition period. Prediction is cold comfort without assurance that it will be backed up.

By substituting prediction for assurance in this fashion, and by giving its prediction such force and effect, the Board's guidelines actually operate to subject communities to instant deregulation, dependent forthwith upon the operation of market forces without the softening benefits of a transition period. Thus, they effectively do away with the transition period provided by the Act.

Petitioners do not now complain of the service they are receiving. They point out, however, that their history over the past months [1] demonstrates that the Board's de-

---

1. In proceedings before the Board, the Aviation Director of Kern County states in affidavit:

"Since January of 1979, I have witnessed:
a) More than a 55% decline in air service patronage;

b) The termination of Las Vegas service by Hughes Airwest;
c) The initiation of Las Vegas service by Apollo Airways;
d) The termination of service to San Francisco, Monterey and Visalia by United Airlines;

termination did not provide them with the service actually needed by the community while new airlines were establishing themselves. They argue that there is no assurance that what happened during the past months will not happen again.

It may well be, as the Board predicts, that market forces in due course will regularly provide all the air service needed by a community. The Act proceeds on the assumption that after transition this will be the case. A community is, nevertheless, during the transition period entitled to assurance that market forces will operate in accordance with the Board's prediction and that if they do not the Board, during that transition period, will provide air service to the level of essential need.

What that level should be remains for the Board to fix in accordance with the provisions of § 1389(f).

I would vacate the Board's order of October, 1979, and remand for further proceedings, looking to a determination of essential air transportation in accordance with § 1389(f).

e) The initiation of premature service to San Francisco with disasterous results;

f) The termination of 25% of Los Angeles service by United Airlines followed by a total termination of that service;

g) The initiation and almost immediate termination of service to Los Angeles by Air Pacific;

h) The entry of Aspen Airways into the Los Angeles market;

i) The initiation and almost immediate termination of Las Vegas service by Sierra Flight Service;

j) A complete turnover in equipment by Swift Airlines;

k) The threat of a corporate takeover of Swift Airlines;

*l*) The acquisition of Air Pacific, and attempted acquisition of Apollo Airways by Gem State;

m) Most recently, a suspension of 20% of its Los Angeles service by Aspen Airlines."