STATE OF SOUTH DAKOTA and City of Pierre, South Dakota, Petitioners,

v.

CIVIL AERONAUTICS BOARD, Respondents.

No. 83–2667.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1984.

Decided Aug. 3, 1984.

Leonard N. Bebchick, Leonard N. Bebchick, P.C., Robert M. Hausman, Hausman & Rosenthal, P.C., Washington, D.C., for petitioners; Thomas C. Walsh, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., of counsel.

Thomas G. Allison, Preston, Thorgrimson, Ellis & Holman, Seattle, Wash., John W. Angus, III, Preston, Thorgrimson, Ellis & Holman, Washington, D.C., for intervenor.

Ivars V. Mellups, Acting General Counsel, Thomas L. Ray, Asst. General Counsel, J. Paul McGrath, Asst. Atty. Gen., Barry B. Grossman, Frederic Freilicher, Dept. of Justice, Washington, D.C., for respondents.

Before HEANEY, BRIGHT and FAGG, Circuit Judges.

FAGG, Circuit Judge.

The State of South Dakota and the City of Pierre petition for review of two orders by the Civil Aeronautics Board allowing Western Air Lines to terminate its service

from Pierre to its eastern destinations, and denying a petition to modify the essential air transportation determination for Pierre. We affirm the Board's orders.

The Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705 (1978), put an end to forty years of comprehensive economic regulation of the domestic airline industry by the Civil Aeronautics Board. *See* Civil Aeronautics Act of 1938, ch. 601, 52 Stat. 973 (1938); Federal Aviation Act of 1958, Pub.L. No. 85–726, 72 Stat. 731 (1958). The Deregulation Act places "maximum reliance on competitive market forces and on actual and potential competition * * * to provide the needed air transportation system." 49 U.S.C. § 1302(a)(4). While previous law required an air carrier to obtain permission from the CAB to terminate its air service to a community, the Deregulation Act allows an air carrier to terminate service to a community simply by giving notice to the Board and affected persons. 49 U.S.C. § 1371(j). Recognizing that sudden deregulation might cause economic disruption to small communities, Congress required that communities served by not more than one certificated carrier receive "essential air transportation" for a period of ten years. 49 U.S.C. § 1389(a)(2)(B). The Board must determine the essential air transportation for these communities and periodically review that determination. 49 U.S.C. § 1389(a)(2)(B) and (C). If a carrier intends to terminate service below the level of essential air transportation, the Board must delay the termination until a replacement carrier can be secured to provide that level of service on a continuing basis. 49 U.S.C. § 1389(a)(6). The Board may subsidize service when denial of termination results in a carrier operating at a loss, or when subsidization is necessary to induce a new carrier to initiate service. 49 U.S.C. § 1389(a)(7)(B).

The Deregulation Act defines essential air transportation as a minimum of two daily round trips, five days a week. 49 U.S.C. § 1389(f). Other than this requirement, the Act expressly leaves to the Board the development of criteria for determining what service "satisfies the needs of the community concerned for air transportation to one or more communities of interest and insures access to the nation's air transportation system." *Id.*

In November 1981 the Board established the level of essential air transportation for Pierre. The Board guaranteed Pierre the following: (1) two daily round trips to both an eastern and western hub airport, and (2) an aggregate of 80 seats outbound and 80 seats inbound each day. The seating capacity guarantee was based on the number of seats necessary to carry 40 passengers to and from designated hubs at a 50 percent load factor. This is the only load factor that we have considered in this case. The Board did not specify how the seats should be allocated between the two directions: "Since traffic flows are constantly changing, we wish to leave the carrier(s) serving Pierre free to react to changes in the distribution of traffic which may occur." Although the level of service guaranteed Pierre was substantially less than the city requested, the Board limited the number of guaranteed seats because "self-sufficient service will nearly always be provided at cities enplaning more than 40 passengers per day."

Initially, Western Air Lines provided the essential air transportation in both directions from Pierre. Western provided two daily round trips with 115-seat jet aircraft over a Salt Lake City-Casper-Rapid City-Pierre-Sioux Falls-Minneapolis/St. Paul routing. On September 15, 1983, Western filed its 90-day notice of intent to suspend service in the Pierre-east market; that is, from Pierre to Sioux Falls and Minneapolis/St. Paul. Western advised the Board that Mesaba Airlines was willing to provide Pierre-east service to Sioux Falls and Minneapolis/St. Paul with 15-seat propeller aircraft. Western stated that it would continue to serve the Pierre-west market with two daily round trips to Rapid City, Casper, and Salt Lake City, using 115-seat jet aircraft. The Board took no action to prohibit Western from terminating service. The Board found, among oth-

er things, that the combined service of Western and Mesaba met Pierre's essential air transportation requirement, that Mesaba would provide more frequent service in the Pierre-east market than Western had provided, and that in fact, Mesaba's proposed service would provide sufficient capacity to accommodate Pierre's traffic to the east. Later the State of South Dakota and the City of Pierre petitioned the Board for a modification of the essential air service determination for Pierre. They argued that because Pierre has two distinct markets, one to the east and one to the west, the Board should make separate essential air service determinations and guarantee specific seating capacity levels in each market. The Board rejected this argument and denied the petition. The central issue on appeal is whether the Board properly allowed Mesaba to replace Western in the Pierre-east market. Essential to that determination is whether the Board properly rejected petitioners' request to establish a separate essential air transportation level for the Pierre-east market.

■■■ Initially, we must determine the appropriate standard of review. We believe there are two. The Board's decision allowing Western to terminate its Pierre-east service is based upon factual considerations drawn from an informal, nonadversarial record consisting of information and comments submitted by opposing sides and interested parties. Because we believe the judicial review statute can be applied to the record before us, we will review the Board's findings under the substantial evidence standard. *See* 49 U.S.C. § 1486(e); *White Industries, Inc. v. FAA*, 692 F.2d 532, 534 (8th Cir.1982); *Nebraska Department of Aeronautics v. CAB*, 298 F.2d 286, 293 (8th Cir.1962). *See also Aircraft Owners and Pilots Association v. FAA*, 600 F.2d 965, 969–72 (D.C.Cir.1979). *But see Rombaugh v. FAA*, 594 F.2d 893, 896–97 (2d Cir.1979); *Tiger International, Inc. v. CAB*, 554 F.2d 926, 934–37 (9th Cir.), *cert. denied*, 434 U.S. 975, 98 S.Ct. 532, 54 L.Ed.2d 467 (1977). Our review of the Board's interpretation of essential air transportation is based upon a different standard. The construction of a statute by an agency charged with its administration is entitled to substantial deference. *United States v. Rutherford*, 442 U.S. 544, 553, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979); *Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1315 (8th Cir.1981). A deferential standard of review is particularly appropriate in a case such as this, in which the statute being interpreted is "untried and new." *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, —— U.S. ——, ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at ——, 104 S.Ct. at 2782, n. 11. In short, the question before us is whether the Board's view of the statute is a reasonable one. *See id.* at ——, 104 S.Ct. at 2782.

In this case, when Western notified the Board of its intention to suspend service in the Pierre-east market, the Board considered whether Mesaba's proposed replacement service would satisfy the essential air transportation requirement for Pierre. Using the 1981 essential air transportation determination, the Board first found that the requirement of two daily round trip flights to both the east and the west were satisfied by Western's two daily round trip flights to Rapid City, Casper, and Salt Lake City and by Mesaba's three daily round trip flights to Sioux Falls, two of which continued on to Minneapolis/St. Paul. Additionally, the Board found that the daily aggregate seat requirement of 80 seats inbound and 80 seats outbound was

easily satisfied by the combined service of Western's two daily round-trip flights to the west (230 seats inbound, 230 seats outbound) and Mesaba's three daily round trips to the east (45 seats inbound, 45 seats outbound). There is no dispute that the Board correctly determined that the combined service of Western and Mesaba is sufficient under the 1981 essential air transportation determination. South Dakota and Pierre contend, however, that the statute required the Board to make a separate essential air transportation determination in the Pierre-east market before it properly could decide whether to permit Western to terminate its service from Pierre to the east.

■ Although the Board declined petitioners' invitation to formulate a separate essential air transportation determination for the Pierre-east market, we believe that the Board's orders demonstrate that it made a careful, individualized analysis of Pierre's air transportation needs. The Board recognized that Pierre, as a state capital, has unique needs for an adequate transportation system. Additionally, the Board agreed that Pierre has two distinct markets—one to the east and one to the west—and the Board stated that it was for this reason that it required that Pierre receive two daily round trip flights in each direction. The Board concluded, however, that there was no current need for a seat allocation, or a separate essential air transportation determination for the Pierre-east market, because Mesaba's service in the Pierre-east market would be sufficient to meet Pierre's needs.

The Board considered the traffic in the Pierre-east market and noted that according to Pierre's figures, daily enplanements had averaged 29 in 1981, 27 in 1982, and 37 during the first ten months of 1983. The Board observed, however, that these figures were inflated because of certain heavily discounted fares offered by Western that will not be offered by Mesaba. In a previous order the Board has stated that historically, about 21 passengers per day had boarded at Pierre to travel east. The

Board also considered air traffic during legislative sessions for a period of seven years and found no marked increase in demand during those periods. The Board concluded that Mesaba's service of 45 seats per day in each direction would be sufficient to accommodate the traffic in the Pierre-east market. Indeed, hindsight provides support for that conclusion: early reports from Mesaba indicated that only 62% of its seats had been filled and less than 8% of its flights had been sold out.

The Board also considered Mesaba's proposed schedule and found it superior to Western's schedule. The Board observed that of Mesaba's three daily round-trip flights to Sioux Falls, two would continue on to Minneapolis/St. Paul, the center of Mesaba's system and a major destination for Pierre travelers. In contrast, Western had already announced that it would suspend service in the Sioux Falls-Minneapolis/St. Paul market and thus would carry Pierre passengers only as far as Sioux Falls. Additionally, the Board noted that Mesaba offered a morning flight to Sioux Falls and Minneapolis/St. Paul while Western's first flight to the east did not depart until after two in the afternoon, a matter of longstanding concern to the Pierre community.

The Board also considered the reliability and appropriateness of Mesaba's equipment and service. As a general matter, the Board requires that aircraft have at least two engines, two pilots, and unimpeded entry through airstair doors. 14 C.F.R. § 398.4(d), (f). The usual policy of the Board is not to require pressurized aircraft unless absolutely necessary to provide usable air service at the eligible community. 14 C.F.R. § 398.6(e). The Board found that Mesaba's fleet of 15-seat Beech 99 aircraft met its requirements. Further, the Board found that Mesaba was a well-established commuter carrier, that it had completed over 96% of its flights during the year ending June 30, 1983, and that its equipment was reliable. Pierre is not seeking permanently to retain Western's service for its eastern market; instead, Pierre told the

Board that it only wanted Western held in place until a carrier operating 30- to 50-seat aircraft is obtained. In this regard we think it is worth adding that according to the record, Mesaba has contracted to purchase three 36-seat pressurized turboprop airplanes which should be operational in 1985. Thus, Mesaba will soon be in a position to accommodate Pierre's apparent desire for somewhat larger aircraft.

The Board had a substantial basis for its findings that Pierre's actual traffic demand to the east could be met by Mesaba, that its scheduling was superior to Western's, and that Mesaba's equipment and service were reliable and appropriate. Based upon the Board's findings. we cannot say that the Board violated its statutory mandate under 49 U.S.C. § 1389(a)(6) when it allowed Mesaba to replace Western's service in the Pierre-east market.

We also believe that the Board's decisions in this case were consistent with the policies of the Deregulation Act. As the Ninth Circuit has observed, the Deregulation Act reflects competing policy considerations. *See County of Kern v. CAB*, 671 F.2d 1223, 1226 (9th Cir.1980). A major purpose of the Deregulation Act was "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services * * *." 92 Stat. 1705, 1705 (1978). "[A] competing policy requires the Board also to determine certain small communities' needs for air transportation to one or more communities of interest and to insure that the small communities have access to the nation's air transportation system." *County of Kern v. CAB, supra,* 671 F.2d at 1226.

In *County of Kern v. CAB, supra,* 671 F.2d at 1223, the Ninth Circuit examined the Board's policy with respect to essential air transportation. In that case, the Board had issued an order setting the essential air service for Bakersfield, California, at 80 passengers, and 160 seats, to and from Los Angeles and San Francisco on a daily basis. This minimum seating guarantee was less than the normal traffic generated at Bak-

ersfield and far below the 1400 seat guarantee that Bakersfield had requested. The Board's determination was in accordance with its general policy of not fixing a community's essential air service level at a number of flights that will accommodate more than 80 passengers (40 inbound, 40 outbound) each day. *See id.* at 1226. Kern County and Bakersfield argued that the Deregulation Act required a definition of "essential air transportation" in accordance with the particular needs of their community. The Ninth Circuit rejected this argument and concluded that in light of the competing policies in the Deregulation Act, the Board's interpretation of essential air transportation was reasonable:

> On the one hand, it relies heavily on actual and potential competition and provides an environment for smaller, cost efficient airlines to become established in markets where the major airlines can operate only at a loss. * * * On the other hand, it guarantees access by small communities to this nation's air transportation system. The number of seats guaranteed was not established arbitrarily, but was based on reliable, unrebutted studies which showed that markets with a certain number of passengers would automatically be provided adequate service by the free market.

*Id.* We believe the *County of Kern* decision is supportive of two important points that are relevant to Pierre's situation: (1) the Board is not required to allocate the essential air transportation seating capacity guarantee among the community's air routes, or make a separate essential air transportation determination for each route; instead, the Board is permitted to make an essential air transportation determination for an eligible community as a whole; and (2) the decision supports the Board's view that the essential air transportation program was not intended to be a device for guaranteeing convenient service to communities that are sufficiently large to support air service without government intervention.

We observe that nothing in the statute itself requires the Board to allocate an essential air transportation determination among separate markets, or to make separate essential air transportation determinations for those markets. Moreover, the Board's policy of not allocating the total seat capacity guarantee is consistent with the competing policies of the Deregulation Act. In denying Pierre's request for a separate essential air transportation determination for the eastern market, the Board stated:

> As a general rule regarding communities that are guaranteed service to two hubs, the two round trip requirement to each hub assures the community of a useful service level to each. We leave any service in excess of the two round trip level to management's discretion, as long as the point's total capacity requirements are being met.

We believe this policy is consistent with the intent of the Deregulation Act to place maximum reliance on competitive market forces. Neither is it inconsistent with the essential air transportation program, which was intended to ease the transition to deregulation, but only insofar as necessary to assure access by eligible communities to the nation's air transportation system. We believe that the Board's actions with respect to Pierre reflect a reasonable accommodation of these competing policies in the Deregulation Act. Pierre's guarantee of two flights inbound and outbound, to both the east and the west each day, combined with its aggregate minimum seat guarantee, provide it with reasonable access to the nation's air transportation system. We find no unreasonableness in the Board's failure to allocate the seat guarantee between the eastern and western markets, or in its refusal to make a separate essential air transportation determination for the Pierre-east market. We recognize that it is not our role to impose upon the Board our own view of the best possible construction of the statute. The question is whether the Board's construction is a reasonable one, and we believe that it is.

Finally, we note that according to the record in this case, Pierre seems to be receiving adequate service to meet its air transportation needs. Mesaba is now providing three flights per day to the east, without subsidy, although it is only required to provide two flights per day. Mesaba's service to the east, with 45 seats, is able to accommodate a market that historically has generated approximately 21 passengers per day to the east. Only a small fraction of Mesaba's flights have been filled since it has begun its service in Pierre. There is sufficient demand in the Pierre-west market that Western is now able to offer its two daily round trip jet flights to Rapid City, Casper, and Salt Lake City without subsidy. Additionally, a commuter carrier affiliated with Frontier Airlines offers two daily round trip flights from Pierre to Denver without subsidy. Thus, we believe that Pierre and the State have reason to be optimistic "that the market will respond to the substantial demand for service with aircraft having adequate capacity * * *." See Petition of State of South Dakota and City of Pierre for Temporary Modification of Essential Air Service Level, Civil Aeronautics Board No. EAS–813, p. 3.

We recognize that under the Deregulation Act essential air transportation is not what service a community "might like to have, or even what service it might need." City of New Haven v. Civil Aeronautics Board, 618 F.2d 955, 968 n. 28 (2d Cir. 1980). When Congress enacted the Deregulation Act, it clearly contemplated that some communities would receive service by smaller airlines and with smaller planes than those to which the community had grown accustomed. To ease the transition, Congress determined that certain communities would be guaranteed a minimal level of essential air transportation. We cannot conclude that the Board has acted unreasonably in determining what level of air transportation is essential for Pierre, nor has it allowed Pierre to fall below that level of essential air transportation.

Accordingly, the orders of the Board are affirmed.