CAVANAGH, J.
(dissenting). Today the majority takes its most recent stride in eroding the statutory and constitutional rights of criminal defendants. Despite the Legislature’s clear intent to bestow the right at issue, the majority elects to divest this Court of the ability to redress a violation of the right. Faced with a complaint that a police officer prohibited defendant from exercising his legislatively sanctioned constitutional right to an independent chemical test, the majority’s magic wand of an opinion makes the right disappear. Today’s edict puts Michigan citizens on notice that when the Legislature grants an explicit right —indeed, one with a constitutional dimension — but sees fit to leave the remedy for violating that right to a court’s discretion, the right is really no right at all. The “consolation” the majority provides is the ability to tell the jury that the right was violated. So drivers be warned: Although our Legislature decided that you have an indelible right to a reasonably requested independent chemical test, this Court finds that if you attempt to exercise that right, the decision whether you are permitted to do so rests solely in the hands of your jailer. If that person decides, for good reason, bad reason, or no reason at all, to deprive you of that right, so be it. Thanks to the majority’s continued plod through the volumes of our law, there are no meaningful consequences to that decision, so we have now amassed another right not worth the paper the Legislature printed it on.
The Oz-like curtain behind which the majority hides is its pronouncement that because the Legislature did not provide a remedy, courts are powerless to enforce *469 the statute. Rather than rectify the violation, a court can only make available a nonmandatory jury instruction that tells the jury that the right was violated, which instruction serves no remedial purpose.[1] This is in spite of the Legislature’s purposeful use of the word “shall” when bestowing the right. A legislature that purposefully enacts a “mandatory” right while intending at the same time that it not be enforced would be an odd one indeed. Thus, to the trash bin goes the tenet that the job of a court is to discern and implement legislative intent because to hold that no enforcement was intended flies in the face of all logic. When the Legislature does not specify a particular remedy for violation of a mandatory right, it is incumbent on this Court to adjudicate a fair and just resolution in as best accord with legislative intent as possible. The remedy should actually, not theoretically, hypothetically, or suppositionally, rectify the violation. But instead of providing a way to truly remedy the situation of a defendant who was denied his mandatory right to an independent chemical test, the majority merely declares this Court powerless, shrouding the unreasonableness of its decision in the veil of a jury instruction of negligible force.
In direct contradiction of its oft-repeated mantra that no word in a statute can be changed or rewritten, the majority does indeed rewrite the statute of concern. MCL 257.625a(6)(d) states that a person who makes a reasonable request for an independent chemical test “shall” be given a reasonable opportunity to procure one. Notably, the Legislature did not choose the word “may” or “can” or “might.” It chose “shall,” with all its consequent mandatory implications. This Court has *470 repeatedly held that “shall” is not permissive. See, e.g., People v Francisco, 474 Mich 82, 87; 711 NW2d 44 (2006); Burton v Reed City Hosp Corp, 471 Mich 745, 752; 691 NW2d 424 (2005); Scarsella v Pollak, 461 Mich 547, 549; 607 NW2d 711 (2000); Oakland Co v Michigan, 456 Mich 144, 154; 566 NW2d 616 (1997) (opinion by KELLY, J.). To hold that there is no meaningful remedy for violating a mandatory right directly contravenes the unambiguous rule of construction that no word in a statute can be rendered nugatory.
Preventing a court from enforcing this mandatory statute by truly remedying a violation of it not only rewrites the statute but does immeasurable violence to legislative intent. By failing to permit a meaningful remedy for a violation of the right the statute bestows, the majority changes “[you] shall be given a reasonable opportunity” to “it does not matter if you get an opportunity, but you can ask that the jury be told if you did not.” In doing so, the majority fully emasculates the Legislature’s clear intent to create a mandatory requirement, for a mandatory right with no meaningful remedy for its violation is no right at all.
The majority bases its reasoning in part on the fact that in § 625a(8) of the statute, the Legislature specified a remedy for violating that subsection. Ante at 443-444. Had the Legislature intended a remedy for § 625a(6), the majority reasons, then it would have provided one like it did in § 625a(8). I am not distracted, as is the majority, by that path of least resistance, for statutory analysis is neither one-dimensional nor necessarily simplistic. When comparison to another statute does not answer the question whether a remedy was intended, this Court should not simply close the books *471 and end the inquiry.[2] Rather, it is incumbent on us to use the additional rules and tools available to us until we discern the legislative intent. And those additional mechanisms, if used, lead to this conclusion: The Legislature is satisfied with the remedy of dismissing the charges when a defendant makes a reasonable request for an independent chemical and is denied that right.
The majority ostensibly recognizes that discerning legislative intent is the primary goal of statutory construction. Ante at 442-443. But while the majority duly notes that the Legislature did not specify a remedy for violating the statute, it refuses to also consider that the Legislature has declined to repudiate the longstanding remedy of dismissal or specify some other remedy in the 12 times over 43 years that it has amended the statute since our decision in People v Koval, 371 Mich 453; 124 NW2d 274 (1963). In Koval, of course, we held that dismissal was the proper remedy for violating § 625a(6)(d).[3] It bears repeating that the Legislature is presumed to know of our case law. Gordon Sel-Way, Inc v Spence Bros, Inc, 438 Mich 488, 505-506; 475 NW2d 704 (1991). Nonetheless, 12 times over, it has deliberately chosen to leave this Court’s holding in place, while making other, at times substantial, changes to the law. Thus, it is perfectly logical, indeed, incumbent on us, to *472 conclude that the Legislature has not sensed any urgency either in invalidating the Koval decision or incorporating the remedy we found prudent in Koval because its intent is being carried out through that precedent. Because the Legislature has not acted to invalidate Koval, despite having 12 opportunities over 43 years to do so, we must presume it is satisfied with what this Court did in that case.
In stark contrast to this majority, our United States Supreme Court recognizes that the reenactment doctrine is a legitimate tool to assist in determining legislative intent. Central Bank of Denver, NA v First Interstate Bank of Denver, NA, 511 US 164, 185; 114 S Ct 1439; 128 L Ed 2d 119 (1994) (“When Congress reenacts statutory language that has been given a consistent judicial construction, we often adhere to that construction in interpreting the reenacted statutory language. See, e.g., Keene Corp v. United States, 508 U.S. 200, 212-213 [113 S Ct 2035; 124 L Ed 2d 118] [1993]; Pierce v. Underwood, 487 U.S. 552, 567 [108 S Ct 2541; 101 L Ed 2d 490] [1988]; Lorillard v. Pons, 434 U.S. 575, 580-581 [98 S Ct 866; 55 L Ed 2d 40] [1978].”). See also United States v Rutherford, 442 US 544, 554 & n 10; 99 S Ct 2470; 61 L Ed 2d 68 (1979). The majority’s choice to ignore, and alternatively misapply, the reenactment doctrine plainly illustrates that it is not interested in truly discerning legislative intent but is satisfied with reaching a decision using less than all available mechanisms. Unjustifiably, the majority deprives a defendant of an ability to have a violation of his or her rights rectified merely because it has a personal aversion to the widely utilized reenactment rule. But applying this perfectly applicable tool of statutory construction not only provides needed interpretive assistance, but also assists in reaching a conclusion that is indubitably more logical than the one reached by the majority. Put *473 another way, the majority’s refusal to account for the Legislature’s decision not to invalidate Koval through its multiple reenactments results in a holding that a defendant given a mandatory right has no meaningful remedy for its violation. But taking into account the Legislature’s choice not to change the result in Koval in its 12 reenactments of the statute since that 1963 decision results in the inescapably more sensible conclusion that a remedy does indeed exist, and that the remedy is that which this Court set forth in Koval. Misguided by its view that the Legislature would be so inefficient so as to fail to correct an erroneous interpretation of the law, this majority chooses to disregard rules of statutory construction to deprive drivers of a mandatory right.
In addition, the majority fundamentally misunderstands the workings of the reenactment doctrine by misapplying its statements in Neal v Wilkes, 470 Mich 661, 668 n 11; 685 NW2d 648 (2004). The majority claims that the reenactment doctrine is inapplicable here because “the amendments to MCL 257.625a(6)(d) do not clearly demonstrate through words the Legislature’s intention to adopt or repudiate Koval’s interpretation of the statute.” Ante at 445 n 7. The majority misses the point: The Legislature’s failure to repudiate Koval in any of the 12 amendments to the statute is the clear indication that it accepted Koval. If the majority means that there must be some overt wording to that effect, then the majority renders the reenactment doctrine completely useless because obviously the Legislature’s intent would then be clear from its words, and no determination whether it meant to adopt or repudiate the case would be necessary.
Along the same lines, the majority states that I disregard “the rule of statutory construction that *474 courts cannot assume that the Legislature inadvertently omitted language from one portion of the statute that it placed in another portion of the statute.” Ante at 446 n 7 (emphasis added). First, I do not believe that the Legislature “inadvertently” omitted anything. Rather, in accord with the widely used reenactment doctrine, I conclude that the Legislature very advertently accepted the remedy we found necessary in Koval. Moreover, I choose not to rely solely on the rule of statutory construction the majority cites at the expense of ignoring other applicable rules that can aid in the analysis. The majority’s selective use of rules of construction is transparent.
Further, the majority cites Neal for the proposition that the reenactment doctrine is a useful tool of statutory interpretation when statutory language is ambiguous. Ante at 445 n 7. The majority must believe that the language of the statute at issue here is ambiguous because it sanctions a jury instruction despite recognizing that none is clearly permitted in the language of the statute. I, too, believe that the remedy to be afforded a defendant who is divested of his mandatory right was initially left ambiguous by the Legislature. The difference in the approach taken by the majority and the dissent is that the majority ignores an applicable rule of construction that would lead to the conclusion that dismissal is the proper remedy, while I would employ it. Clearly, the majority’s attempt to circumvent the reenactment doctrine is not soundly based.
The majority also unconvincingly attempts to disclaim that an important consideration in this case is the mandatory nature of the right to an independent chemical test. See ante at 446 n 7. I fail to see how we can determine what remedy best alleviates a violation of this right without first determining the level of entitle *475 ment to the right. For instance, if the police had discretionary authority to honor a request for an independent chemical test (and if there were no constitutional ramifications of a denial of that right), then it is by no means certain that the proper remedy would be dismissal. But the fact that the Legislature made this right mandatory weighs, or should weigh, heavily on the analysis.
The majority also asserts a correlation between this case and People v Sobczak-Obetts, 463 Mich 687; 625 NW2d 764 (2001), relying on that case to avoid finding an available remedy for the current defendant. In Sobczak-Obetts, the police violated MCL 780.654 and 780.655 by failing to produce an affidavit with the otherwise valid warrant used to search the defendant’s home. Notably, the defendant never argued that she was deprived of a constitutional right. See Sobczak-Obetts, supra at 697 n 9. In the Court of Appeals, the statutory requirement of producing the affidavit was characterized as “ ‘more of a ministerial duty than a right’ ” and “ ‘only barely relating] to the substantive right the Legislature is seeking to protect.’ ” Id. at 693, quoting 238 Mich App 495, 503-504 (HOEKSTRA, J.). The majority agreed with that description, elaborating that the statutory requirement is a “procedural requirement[] that [is] to be followed by the police during and after the execution of an otherwise facially valid search warrant.” Sobczak-Obetts, supra at 707-708 (emphasis in original). The requirement of producing the affidavit, in the majority’s view, was “ministerial,” id. at 710, “administrative,” id., and “technical,” id. at 712. Thus, because the majority found that there was no legislative support for suppressing the fruit of a search when the police had committed a violation that was “technical,” did not diminish the probable cause for the search, and *476 did not violate the defendant’s constitutional rights, the majority declined to provide a remedy.
Despite whether one agrees with the majority’s analysis in Sobczak-Obetts, any reliance on that case is drastically misplaced. The right bestowed by MCL 257.625a(6)(d) is hardly “technical,” “ministerial,” or “procedural.” Rather, exercising the right to an independent chemical test under § 625a(6)(d) to gather physical bodily evidence is the only way a physically restrained drunk driving suspect can obtain such evidence. Moreover, and just as important, that independent test result is the only evidence available to a defendant to refute evidence the police gather by taking their own chemical tests. Equally important, the evidence is perishable, so once the extremely short window of time in which a defendant can obtain the evidence elapses, that evidence is forever unavailable. The result is that the defendant is left with absolutely no meaningful way to refute the prosecutor’s chemical evidence against him in a criminal trial. See, e.g., State v Minkoff, 308 Mont 248, 253-255; 42 P3d 223 (2002), discussed later in this opinion.
The majority’s assertion that, in lieu of using the results of the independent chemical test a defendant was deprived of obtaining, the defendant can simply “adduce nonchemical evidence, such as the testimony of a toxicology expert, who can give an expert opinion on the defendant’s body alcohol level based on the number of drinks the defendant consumed over a course of time,” ante at 455 n 20, is simply unpersuasive. Not only does that idea ignore the uncorrelative character of the different types of evidence, but the notion that a person’s body alcohol level can be prognosticated on other bases is similar to the “deceptively simple process” of retrograde extrapolation, see Bostic, Alcohol- *477 related offenses: Retrograde extrapolation after Wager, 79 Mich B J 668 (2000), and presents the same problems. The discussion in J. Nicholas Bostic’s article illuminates the significant debate within the scientific community over the reliability of prognosticated evidence. Id. at 669. This is because the “variability in the human response to alcohol (ethanol)” is “exacerbated by the difficulties in measuring the effects of alcohol on the human body and of human enzymes on alcohol.” Id. While a lengthy recapitulation of the article is unnecessary here, the complexities involved in attempting to divine a person’s body alcohol level through nonchemical means should not be underestimated. Among the factors bearing on the analysis are the timing of the onset of the postabsorptive stage, elimination rates, the effect of food on the postabsorptive onset, frequency of alcohol use, race, gender, interindividual differences, intraindividual differences, pathological conditions, and acid-blocking drugs.
As the article’s citation of various studies illustrates, for any expert or study that one side can offer to support a particular premise, the other side is likely to be able to offer an expert or study that directly refutes that premise. Moreover, as the article also illustrates, while there may be a relatively consistent range of accuracy in extrapolation, it is, nonetheless, a range.[4] *478 But when a defendant is trying to prove that his body alcohol level did not exceed a very precise statutorily proscribed level, namely, 0.08 grams of alcohol per 100 milliliters of blood, per 210 liters of breath, or per 67 milliliters of urine, it is of little help that an expert might be able to demonstrate a range into which the defendant’s body alcohol level likely fell. Thus, it is hardly consoling for the majority to pronounce that a defendant can simply offer expert testimony on his body alcohol level “based on the number of drinks the defendant consumed” or that “[t]he instruction gives the defendant an adequate opportunity to defend himself by arguing that the police-administered test was inaccurate and that an independent test would have produced a different result.” Ante at 455 n 20, 457 n 21. Despite what nonchemical evidence the defendant can find to produce, the prosecutor will hold the clear advantage in that not only can he rebut any nonchemical evidence with expert testimony, but he alone possesses the results of a chemical test to which the defendant has no rebuttal at all.
Further, despite Justice CORRIGAN’s interpretation of the principles she cites from three writings of her late husband and a foreword by Justice MARKMAN, see ante at 456-457,1 fail to see how the truth-seeking process is enhanced or furthered by not only denying a defen *479 dant’s mandatory right to gather evidence in his defense, but also allowing the prosecutor to present evidence that the state has made impossible for the defendant to rebut. I do not believe this is the type of “truth-seeking process” envisioned by either the framers of our constitutions or by commentators on the criminal justice system. In fact, a passage quoted by Justice CORRIGAN belies her assertions that a jury instruction is sufficient to protect a defendant’s right to a fair trial when the right denied defendant deprives him of “ ‘an adequate opportunity to defend against the charges.’ ” See ante at 456, quoting Grano, Implementing the objectives of procedural reform: The proposed Michigan Rules of Criminal Procedure-Part I, 32 Wayne L R 1007, 1018 (1986). Professor Joseph D. Grano was completely correct when he wrote the words Justice Corrigan quotes:
“[T]he primary objective of criminal procedure is to facilitate the ascertainment of truth. To some extent, therefore, fairness must encompass this concern. Accordingly, rules are unfair when they do not provide either party an adequate opportunity to develop and present his case. The special concern with fairness for the defendant, however, stems from the special abhorrence of erroneous conviction. Thus, basic agreement exists that a rule is unfair if it denies the defendant an adequate opportunity to defend against the charges." [Ante at 456, quoting Grano, supra at 1018 (emphasis added).]
It is for the reasons Professor Grano outlined that the majority is misguided in asserting that dismissal is an inappropriate remedy because “the truth will never be discovered.” See ante at 457 n 21 (emphasis omitted). Simply, denying a defendant’s right to obtain evidence[5] in *480 his defense also prevents the truth from ever being discovered and exposes a defendant to the possibility of being wrongfully convicted, despite the “special concern for fairness” and “special abhorrence of erroneous conviction” identified by Professor Grano. And therein lies the fundamental difference of approach. While the majority favors rewarding the deprivation of the right to obtain evidence by proceeding with trial and exposing the defendant to wrongful conviction to further what it perceives as the “truth-seeking process,” I favor a meaningful remedy that encourages the police to act according to a mandatory statute,[6] which in turn pro *481 tects a defendant’s right to a fair trial. This, in my view, is the more constitutionally sound fostering of the truth-seeking process.
It can be no clearer that a defendant’s Sixth Amendment right to present a full defense is implicated when he is deprived of his codified right to an independent chemical test.[7] While the right to the test has been codified, the violation of the right is an unconstitutional deprivation of a defendant’s right to a fair trial. Indeed, the intent behind § 625a(6)(d) further demonstrates that the Legislature never meant to afford one party scientific evidence while denying the other party an ability to independently obtain the same, thus further rebutting the majority’s assertion, ante at 457 n 21, that a jury instruction sufficiently assists the “truth-seeking process”:
The intent of the Legislature in enacting MCL 257.625a(5); MSA 9.2325(1)(5) was to allow the production and preservation of chemical evidence in an orderly manner. Broadwell v Secretary of State, 158 Mich App 681, 686; 405 NW2d 120 (1987). The petitioner in Broadwell argued that he was entitled to have a person of his choosing administer the test without first being subjected to a chemical test by the police officer. However, this Court found that such a construction of the statute would place the only scientific evidence of chemical impairment within *482 the petitioner’s sole disposal, contrary to the legislative intent of the statute. Id. In People v Koval, 371 Mich 453, 458; 124 NW2d 274 (1963), our Supreme Court found that the then existing statute, which does not significantly differ from the current one, was enacted for the protection and benefit of motorists charged with driving while under the influence of intoxicating liquor. Thus, it may be said that the Legislature intended that the scientific evidence shall not be at the sole disposal of either party, and it ensured this result by allowing police to administer one test and allowing the accused to choose an independent person to administer a second chemical test. [People v Dicks, 190 Mich App 694, 698-699; 476 NW2d 500 (1991) (emphasis added).]
Further, the majority’s centering of its analysis on its characterization that the evidence defendant was deprived of, namely, an independent chemical test of his body alcohol level, was evidence that had not yet been “developed” is simply a game of semantics. See ante at 461. For despite the majority’s strenuous attempt to minimize the importance of the right or the subsequent significance of the evidence, the fact remains that defendant had a due process right to obtain the evidence, whether that entailed “creating” it, “developing” it, or any other way of getting it, however stated. Simply, defendant sought to exercise his mandatory right to procure independent chemical testing, and, thus, documentation, of his already-existing body alcohol level at the time he was taken into custody. And he sought to exercise this right because the Legislature penned a statute that grants the right to do so. When the majority’s fallacy of logic is exposed, its constitutional analysis falls apart.
The correct conclusion, and one that the trial court reached, is that the right at issue, though codified through statute, implicates a defendant’s constitutional right when violated. Simply, refusing the defendant an *483 opportunity for an independent chemical test “ ‘is to deny him the only opportunity he has to defend himself against the charge.’ ” People v Dawson, 184 Cal App 2d Supp 881, 882; 7 Cal Rptr 384 (Cal Super App Dep’t, 1960), quoting In re Newbern, 175 Cal App 2d 862, 866; 1 Cal Rptr 80 (1959). “[T]he accused has an absolute right to secure witnesses and obtain additional evidence to counteract the evidence obtained by the government, to establish a defense and to seek an acquittal. To hold otherwise is to return to the rack and the stake.” State v Myers, 88 NM 16, 23; 536 P2d 280 (NM App, 1975) (Sutin, J., dissenting) (emphasis omitted).
Attempting to bolster its conclusions, the majority selectively extracts the following statement from Arizona v Youngblood, 488 US 51, 59; 109 S Ct 333; 102 L Ed 2d 281 (1988): “ ‘[T]he defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests.’ ” Ante at 462 n 26.[8] One need only view the excised statement in the context of the material from which it was extracted to reject the majority’s curious reliance:
The Arizona Court of Appeals also referred somewhat obliquely to the State’s “inability to quantitatively test” certain semen samples with the newer P-30 test. 153 Ariz., at 54, 734 E 2d, at 596. If the court meant by this statement that the Due Process Clause is violated when the police fail to use a particular investigatory tool, we strongly disagree. The situation here is no different than a prosecution for *484 drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests. [Youngblood, supra at 58-59.]
As the reader can see, Youngblood did not involve body alcohol level testing and it did not involve a statutory right to testing. Clearly, the Youngblood Court was in no way commenting on the due process rights that arise when a defendant is denied a mandatory right to obtain independent testing of his body alcohol level.
In another citation that is inaccurate at best, the majority states that in In re Martin, 58 Cal 2d 509; 374 P2d 801; 24 Cal Rptr 833 (1962), the court held “that the police are not required to assist a defendant in obtaining a chemical test,” and that “ ‘police officers are not required to take the initiative or even to assist in procuring evidence on behalf of a defendant which is deemed necessary to his defense.’ ” Ante at 462, quoting Martin, supra at 512. What the majority omits to tell the reader is that there was no statute that mandated the police to allow a person an opportunity for independent chemical testing. What the majority also omits to mention is that the defendant in Martin “was released within minutes after his ‘booking’ at the police station.” Martin, supra at 512. Because of his fast release, the court concluded that “[n]o meritorious claim can be made that [the defendant] could not, at that time, have obtained a timely sampling if unhampered.” Id.
Similarly, the majority mistakenly relies on State v Choate, 667 SW2d 111, 113 (Tenn Crim App, 1983), for the proposition that “the police have no constitutional duty to take affirmative action to transport the defendant from the place of his or her incarceration to a hospital of his or her choice for the requested test.” Ante *485 at 462. Important, but ignored by the majority, is that the state statute at issue in that case required the suspect to submit to a police-administered chemical test, and the defendant had refused to take that test. Choate, supra at 111-112. The court could not find a due process violation, reasoning as follows:
Since he refused to take the breathalyzer test, the police took no affirmative steps to assist the defendant in obtaining a blood sample. However, the defendant was not hampered or prevented by the police from obtaining a blood test, and he made no effort himself to arrange for a blood test although he had access to a telephone and was accompanied by a friend to the police station. [Id. at 112 (emphasis added).]
The same misplaced reliance is seen in the majority’s citation of People v Finnegan, 85 NY2d 53, 58; 623 NYS2d 546; 647 NE2d 758 (1995). In Finnegan, the state statute allowed for an independent chemical test, but put no obligation on the police to assist suspects with obtaining the test. The statute stated: “Right to additional test. The person tested shall be permitted to choose a physician to administer a chemical test in addition to the one administered at the direction of the police officer.” Veh & Traf Law 1194(4)(b). To the contrary, our statute states, “A person who takes a chemical test administered at a peace officer’s request as provided in this section shall be given a reasonable opportunity to have a person of his or her own choosing administer 1 of the chemical tests described in this subsection within a reasonable time after his or her detention.” MCL 257.625a(6)(d). Thus, by its plain words, the statute requires some affirmative action on the part of the police. For the majority to rely on Finnegan to excuse the police officer’s violation of defendant’s right in this case is simply misguided. What the majority is actually asserting is that our statute *486 places no duty on the police to assist a person who the police holds in custody by honoring the person’s reasonable request to obtain an independent chemical test. Such an assertion rewrites the statute of concern.
As is evident by the above, the majority takes a painfully circuitous journey to reach what is ultimately a conclusion that there is no meaning to the right codified in § 625a(6)(d), and, thus, no purpose to the statute at all. The majority pronounces that there is no available remedy when a statute providing a mandatory right is violated and that the police have no “constitutional duty,” ante at 461-463, to follow the statute. Moreover, in deciding that defendant was not deprived of his constitutional right to an independent chemical test, the majority engages in a pretense. It concludes that the police were not obligated to assist defendant with obtaining an independent chemical test. This is simply incorrect and illuminates that the majority again fundamentally misunderstands the crux of the right at issue.
Minkoff provides a thorough and well-reasoned discussion regarding the due process implications of interfering with a defendant’s right to obtain an independent test. In Minkoff, the defendant, rather than requesting a test, asked the police officer for the officer’s advice regarding whether he should obtain an independent test. Id. at 249. The officer told the defendant that a blood test “ ‘comes out with the exact amount and it’s going to be higher than what the breath test is.’ ” Id. Accordingly, the defendant “did not request an independent blood test.” Id. at 250. Deciding whether the defendant’s due process argument that the officer “frustrated” his right to obtain an independent test had merit, the court provided the following fundamental principles:
*487 It is undisputed that a person accused of a criminal offense has a due process right to obtain existing exculpatory evidence. See State v. Swanson (1986), 222 Mont. 357, 360, 722 P.2d 1155, 1157. It also is undisputed that, when the charged offense is DUI, the accused has a right to obtain a test of the amount of alcohol in his or her blood independent of the test offered by the arresting officer, without regard to whether the accused has taken or rejected the offered test. Swanson, 222 Mont, at 360-61, 722 P.2d at 1157. Finally, it is undisputed that, while a law enforcement officer has no duty to affirmatively assist a person accused of DUI in obtaining an independent blood test, the officer cannot frustrate or impede the person’s efforts to do so. See Swanson, 222 Mont, at 361, 722 P.2d at 1157-58. Moreover, we have held that the accused must be informed of his or her right to independent testing and that failure to so advise is a due process violation. State v. Strand (1997), 286 Mont. 122, 127, 951 P.2d 552, 555.
In the present case, the District Court relied on [State v\ Sidmore [286 Mont 357; 951 P2d 558 (1997)] in denying Minkoff s motion to dismiss. There, we clarified and, in fact, limited “the Swanson rule” that a DUI accused has a due process right to an independent blood test. We held that two criteria must be established to support an allegation of denial of due process rights with regard to the right to an independent test: (1) the accused must timely request the independent test, and (2) the officer must unreasonably impede the right to the test. Sidmore, 286 Mont, at 234-35, 951 E2d at 568-69. Here, Minkoff did not request the independent test and, therefore, on the face of it, the District Court did not err in concluding that the Sidmore criteria had not been met. [Id. at 250-251.]
The court then considered the defendant’s arguments that the officer unreasonably impeded his opportunity to obtain an independent test, and concluded that the officer did indeed do so:
We have held that, while police have no duty to assist an accused in obtaining independent evidence of sobriety, “they cannot frustrate such an effort through either affir *488 mative acts or their rules and regulations.” Swanson, 222 Mont, at 361-62, 722 P.2d at 1158 (see also § 61-8-405(2), MCA, “The peace officer may not unreasonably impede the person’s right to obtain an independent blood test”). Here, the officer’s repeated statements that the blood test would show a higher blood alcohol level, albeit well-intentioned, were affirmative acts which would frustrate, if not obliterate, the intention of any rational arrestee to obtain an independent blood test. Rare, indeed, would be the person who would persist in asking for an independent blood test after being advised — twice—that the amount of alcohol in the blood test result would show as higher than the amount in the offered breath test. We conclude that the officer’s advice frustrated and unreasonably impeded Minkoff s due process right to the independent blood test. [Id. at 252.]
Finally, on the basis of the severely uneven footing on which the deprivation of the opportunity to obtain an independent chemical test placed the defendant, the court overruled its prior case law that held that suppression of the evidence was a sufficient remedy and concluded that the only constitutionally sufficient remedy was dismissal of the charges. See id. at 253-255.
No case cited in the majority’s labored opinion either considered or addressed whether a person’s due process rights are violated when that person submits to a required police-administered chemical test but is nonetheless denied a reasonable request for a statutorily required independent chemical test. But there is no shortage of states in which the deprivation of the right to an independent chemical test has been found to (1) be unconstitutional and (2) require dismissal of the charges. See anno: Drunk driving: Motorist’s right to private sobriety test, 45 ALR4th 11. In Georgia, the court of appeals questioned the use, without enforcement, of a rule requiring a police officer to grant a reasonable request for an independent chemical test: “But of what value is that right if the accused is in *489 custody of law enforcement officials who either refuse or fail to allow him to exercise the right?” Puett v State, 147 Ga App 300, 301; 248 SE2d 560 (1978). An Arizona court, faced with a prosecutor’s argument that the defendant had no right to an independent test unless he first took a police-initiated test, explained:
If the [prosecutor’s] contention was correct, the logical conclusion would be that the police could affirmatively prohibit every driver who refused a breathalyzer test from obtaining independent evidence of his sobriety, in essence suppressing evidence favorable to the defendant. Such a result would be violative of due process of law. [Smith v Coda, 114 Ariz 510, 512; 562 P2d 390 (Ariz App, 1977) (staying the prosecution on charges related to intoxicated driving).]
Further, in Provo City v Werner, 810 P2d 469 (Utah App, 1991), the court highlighted the due process concerns inherent in a defendant’s right to an independent chemical test. That court stated:
Similarly, all that is required to provide due process is an opportunity to obtain an independent test. “The purpose of due process is to prevent fundamental unfairness, and one of its essential elements is the opportunity to defend.” State v. Snipes, 478 S.W2d 299, 303 (Mo.), cert. denied, 409 U.S. 979, 93 S.Ct. 332, 34 L.Ed.2d 242 (1972). “The issue is whether the defendant was afforded a reasonable opportunity to obtain an independent examination-, it is not necessary that such an examination in fact be conducted.” Commonwealth v. Alano, 388 Mass. 871, 448 N.E.2d 1122, 1127 (1983). See also Bilbrey v. State, 531 So.2d 27, 30 (Ala. Ct. App. 1987) (defendant must prove by clear and convincing evidence that the conduct of the police was unreasonable in order to establish a due process violation). [Id. at 472 (emphasis added).]
Again, by its conclusion that the police did all they were required to do and had no further duty, the majority has changed the language of the statute and *490 rewritten an otherwise plainly worded requirement to eliminate any duty of the police to actually honor the reasonable request of a person attempting to obtain independent chemical evidence. See ante at 462 n 27.
If it is to be given any meaning at all, the statute clearly requires the police to assist in some way when a person attempts to exercise his right to obtain an independent chemical test. Here, of course, the police outright refused to take defendant where he asked to go, a decision that the prosecutor in this case has agreed was unjustifiable. Defendant’s due process right to obtain the test was clearly violated.
Further, not punishing a violation of the statute with the strict remedy of dismissal and allowing the prosecution to go forward with the charges will enable a completely one-sided presentation of the evidence, even if the results of the police-initiated test are suppressed. By disallowing an independent chemical test, the police benefit from a win-win situation. Without scientific evidence, the prosecutor can easily persuade a jury with the police officer’s observation evidence. A defendant can counter that testimony with absolutely nothing but his word.
As a Tennessee court succinctly explained, “We do not believe that simply suppressing the State’s blood alcohol test is a sufficient safeguard of the Defendant’s right to be able to gather and preserve evidence in his defense. This evidence, if favorable to the Defendant, could easily have secured his acquittal.” State v Livesay, 941 SW2d 63, 66 (Tenn Crim App, 1996). And in Washington, the appellate court likewise rejected an argument for suppression of the results of the police-administered test as an adequate remedy. That court’s reasoning bears repeating:
*491 The State contends the proper remedy for violation of Mr. McNichols’ right to obtain an independent blood test is suppression of the State’s breath test results. It argues the purpose of the independent test is to contest the accuracy of the State’s breath test; therefore, if a defendant is unfairly deprived of an opportunity to challenge the State’s test results, denying use of those results levels the playing field and leaves the defendant free to contest any other evidence of intoxication introduced by the State.
We recognize dismissal is an extraordinary remedy, which is unwarranted when suppression of evidence will eliminate any prejudice caused by governmental misconduct. ... Suppression is inadequate in the present case.
In a DWI case the defendant’s condition at the time of his arrest is critical to his defense. To defend against the charge against him, Mr. McNichols would have to present evidence that he was not under the influence of intoxicating liquor at the time of his arrest. That is true regardless whether the State introduces BAC test results or other evidence of intoxication. The State’s interference with Mr. McNichols’ right to obtain an independent alcohol concentration test foreclosed a fair trial by forever depriving him of material evidence which could potentially have supported a claim that he was innocent. Suppression of the State’s BAC test results would not eliminate the prejudice because a favorable blood test is rehable evidence of nonintoxication that could be used to defend against other proof of intoxication. Because the error cannot be remedied by a new trial, dismissal is the appropriate remedy. [State v McNichols, 76 Wash App 283, 289-291; 884 P2d 620 (1994) (citations omitted).][9]
Finally, in Minkoff the court aptly explained why no remedy other than dismissal would rectify the constitutional violation:
*492 In Strand, the issue of dismissal, as urged by the defendant, versus suppression, as argued by the state, was squarely before us. As discussed above, we opted for suppression and, in doing so, distinguished Swanson on the facts regarding whether the state’s offered breath test had been taken or refused. In discussing the appropriate remedy in Strand, however, we made several statements on which we did not follow through. In that regard, while we relied on a Washington Supreme Court case for the proposition that the state cannot be permitted to use scientific evidence of intoxication which the defendant is unable to rebut because he was not apprised of his right to independent testing, we also stated that, while independent blood test results have value as rebuttal-type evidence to the state’s evidence, such results also “have independent value as compelling scientific evidence, regardless of the evidence introduced by the State.” Strand, 286 Mont, at 128, 951 P.2d at 555 (citation omitted). We discussed the possibility that a defendant might elect not to challenge potentially intoxication-related observations by the officer or field sobriety test results, but might produce — if given the opportunity — a scientific blood test conclusively showing a blood alcohol concentration below the legal limit. Strand, 286 Mont, at 128, 951 P.2d at 555-56. Had we followed through on these statements, rather than limiting our focus to the question of “like evidence,” dismissal would have been the appropriate remedy.
Here, the State admitted Minkoffs .167 blood alcohol content as evidence during the jury trial. It also presented the arresting officer’s testimony and videotape evidence on Minkoffs performance on field sobriety tests: he did not successfully recite the alphabet after the letter “T”; he swayed during the one-legged stand and put his hand on a door as a brace; and, during the walk and turn test, he stepped off the line, nearly fell over, and took more steps than he was instructed to take. Suppressing the State’s breath test and allowing a new trial would leave Minkoff unable to rebut the field sobriety test evidence through an independent blood test — the right to which he was effectively denied. We conclude suppression of the breath test *493 results is insufficient to remedy the deprivation of that right and, accordingly, we overrule the remedy set forth in Strand. [Minkoff, supra at 254.]
I find these concepts highly persuasive. Neither ignoring the constitutional violation nor allowing for suppression of the results of the state’s chemical test will rectify the violation or put a defendant on equal footing with that of his accuser. Rather, a police officer can unilaterally place a defendant in a position from which he can never recover — namely, completely without chemical evidence to use to defend against the prosecutor’s chemical evidence. And an officer’s good or bad faith has no bearing on the fact that the defendant is still deprived of the only exculpatory evidence that he might possibly obtain. “This is not a case simply of ‘justice’ or ‘fairness’, in the abstract. Denial to defendant of the opportunity to conduct his own blood test was a denial of access to evidence he might have introduced in his own defense. For this reason, it is a denial of his constitutionally guaranteed due process of law.” Myers, supra at 24. Thus, in my view, nothing less than dismissal cures the violation, for there is no other way to ensure a defendant’s Sixth Amendment right to a fair trial.
A toothless jury instruction designed merely to inform the jury that the right was violated does nothing but elevate the prosecutor’s position over that of the defendant and cannot be any further from adequate. The majority’s proclamation that the case must go forward to preserve the quest for “truth” is simply unpersuasive when the truth-seeking process was deliberately thwarted by the state and resulted in categorically denying defendant the ability to bring any meaningful evidence in his defense. Under the majority’s indiscriminate elevation of its distorted view of the *494 “truth-seeking process” over constitutional due process rights, no constitutional violation will ever merit the dismissal of a case or even suppression of evidence.
I would find that depriving a driver of the mandatory right to an independent chemical test is a due process violation for which dismissal of the charges is the only remedy. To hold otherwise is to not only ignore the clearly mandatory nature of the statute, but to disregard the constitutional implications of its violation. For these reasons, I respectfully dissent.
Kelly, J., concurred with Cavanagh, J.

 The majority carefully avoids calling its proposed instruction a “remedy,” although it claims that a permissive jury instruction “gives meaning” and “concrete effect” to the right. Ante at 457 n 22, 459.

 The majority does indeed close the books on its search for legislative intent after finding no explicit remedy in the statute, despite that it continues on to craft its “nonremedy remedy” of a jury instruction. See ante at 452-453 n 17.

 The majority mistakenly asserts that the Koval Court incorrectly found a remedy despite that “the text of the statute makes clear that the Legislature did not intend the remedy of dismissal to follow from a violation” of the statute. Ante at 447. But considering that the text of the statute conveys a mandatory right, this Court found that dismissal was appropriate. Although the majority tries desperately to do so, the mandatory nature of the right simply cannot be separated from the determination of what remedy exists for violating the right.

 The same is true with respect to the majority’s citation of State v Vliet, 95 Hawaii 94; 19 P3d 42 (2001). See ante at 455 n 20. Despite whether that court found the “Widmark formula” admissible, and despite whether the formula can be said to be widely rehable, this inequitable fact remains unchanged: a defendant is left to rebut chemical evidence with nonchemical extrapolation evidence despite the fact that he was entitled to obtain chemical evidence and was denied his right by the police.
By claiming that that situation is remedied because nonchemical evidence of a body alcohol range can raise a reasonable doubt in a *478 defendant’s favor, the majority does not seem to grasp the unbalanced position into which it places a defendant. Nothing a defendant produces in this regard will go unrebutted by the prosecutor’s own witnesses. So to edge out any reasonable doubt created by a defense expert who can testify to a “range” into which the defendant’s body alcohol level may have fallen, a prosecutor will be armed with eyewitness observation evidence, field sobriety test results, a rebuttal expert for any nonchemical evidence the defendant produces, and, critically, the indisputable results of a chemical test. Undeniably, the scales of justice are tilted heavily in the prosecutor’s favor.

 Oddly, the majority concludes that informing the jury that a defendant was denied his right to an independent test “plac[es] all the facts *480 before the fact-finder,” provides “more, rather than less, information,” “communicate[s] an accurate account of what transpired,” and “gives the jury all of the available relevant information.” See ante at 457 & n 21. The majority also asserts that the instruction informs the jury of “all the pertinent information, including what has been denied to them [sic].” Ante at 457. These propositions are simply incorrect. The “pertinent information” that is not placed before the jury is the results of an independent chemical test. The jury is denied this information and, thus, denied its right to all the facts. The jury thus receives less information than that to which it was entitled and is left with an incomplete account of transpired events. The majority’s insistence that a permissive jury instruction furthers the truth-seeking process is simply backward logic.

 The majority’s claim that the permissive jury instruction will “accord meaning to the right” and “deter police officers from violating that right” is ridiculous. See ante at 450. First, nothing about alerting the jury that a person was deprived of an ability to obtain an independent chemical test “accords meaning” to the right embodied in the statute. Simply, a jury instruction is “too little, too late.” Second, the majority’s rule of law actually encourages police officers to decline a person’s request for an independent test because not only are there are no meaningful negative consequences to that decision, but the police are put in a superior position because they will hold the trump card of indisputable chemical evidence. In this way, police officers are indeed “permit[ted]... to ignore a defendant’s mandatory statutory right____” See ante at 458.
Not surprisingly, the majority disagrees with this assessment, but again, the majority’s simplistic and idealistic view fails to account for the real-world practicalities about the way in which these scenarios will play out. See n 4 of this opinion. Moreover, because the defendant was denied *481 his constitutional right to an independent test, speculation regarding whether the test would have been favorable to him is unhelpful. The very point is that the jury will never know because the defendant was denied his constitutional right to obtain the evidence.

 I address this argument only because the trial court expressed in its opinion its belief that the right at issue was constitutional in nature. The trial court found it unnecessary to base its holding on constitutional principles because it found that the remedy of dismissal was clearly called for. However, it clearly considered the statutory right merely a codification of a due process right. Thus, I find that it would be judicially inefficient to not address this issue.

 In my opinion, to speak in terms of a police officer’s “constitutional duty” obfuscates the issue and detracts from the true question involved. Thus, I believe the question is more accurately addressed in terms of whether a defendant’s constitutional rights are violated when the police fail to comply with their statutory duty to permit a defendant an opportunity to obtain an independent chemical test. While not dispositive of the analysis, those terms avoid overshadowing that it is indeed a defendant’s constitutional right under scrutiny.

9 While the Washington Supreme Court overturned this case on the basis that jail personnel did not interfere with the defendant’s right to get an independent blood test, the Supreme Court agreed with the Court of Appeals that the right was a due process right. State v McNichols, 128 Wash 2d 242; 906 P2d 329 (1995).